UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
GERMAIN CANO, ERIC CEPHUS, KEVIN DARNELL,
PETER EPPEL, MICHAEL GLENN, DEBORAH
GONZALEZ, TRAVIS GORDON, JACQUELINE
GUARINO, KEITH JENNINGS, WESLEY JONES,
GREGORY MAUGERI, MICHAEL MCGHEE,
DMITRIY MILOSLAVSKIY, YVONNE MIND,
STEVEN MODES, KERRY SCOTT, PHILLIP
SINGLETON, MICHAEL SPALANGO, RAYMOND
TUCKER, NANCY VIGLIONE, ELLI VIKKI, individually
and on behalf of a class of all others similarly situated,

DECISION AND ORDER
13-cv-3341 (WFK) (VVP)

                        Plaintiffs,

-against-

THE CITY OF NEW YORK, POLICE COMMISSIONER
RAYMOND KELLY, DEPUTY COMMISSIONERS
JOHN DOES 1-5 (representing the Deputy Commissioners
who supervised the operation of Brooklyn Central Booking
from June 12, 2010 to the present), POLICE OFFICERS
JOHN DOES 1-5 (representing the commanding officers of
Brooklyn Central Booking from June 12, 2010 to the
present),

                        Defendants.
-----------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Plaintiffs bring this action seeking compensatory damages for the allegedly inhumane prison conditions they endured while detained at Brooklyn Central Booking ("BCB"). Plaintiffs spent ten to twenty-four hours at BCB between their arrests and arraignments. During this time, Plaintiffs were allegedly subjected to overcrowding; sleep deprivation; inadequate/unsanitary toilets; denial of access to toiletries, toilet paper, and other hygienic materials; inadequate water and meals; extreme temperatures; inadequate ventilation; unsanitary conditions; infestation, unchecked crime; and a substantial risk of physical and medical harm. As Plaintiffs were pretrial detainees, they could not constitutionally be punished—neither cruel and unusually nor otherwise. Plaintiffs allege that the Defendants were deliberately indifferent to a serious risk of harm facing detainees at BCB in violation of their rights under the Due Process Clause of the Fourteenth Amendment. Defendants now move to dismiss the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons below, Defendants' motion is denied.

## FACTUAL BACKGROUND

Plaintiffs are twenty-one individuals who were detained at BCB between their arrests and arraignments for a single ten to twenty-four hour period since June 12, 2010.[1] Dkt. 10 (Second Amended Complaint ("Compl.")), ¶¶ 1, 5, 6, 19. Defendants are the City of New York, (now former) New York City Police Commissioner Raymond Kelly, NYPD First Deputy Commissioner Rafael Pineiro, NYPD Captain Kenneth Kobetitsch, and NYPD Captain William Tobin. Defendant Kelly was the Commissioner of the NYPD from 1992 to 1994 and from January 2002 until 2013. Compl. ¶ 8. Defendant Pineiro is the current First Deputy Commissioner of the NYPD and was the supervisor of BCB operations from June 12, 2010 until, at least, the filing of this action. Compl. ¶ 9. Defendants Kobetitsch and Tobin were the commanding officers of BCB from June 12, 2010 until, at least, the filing of this action. Compl. ¶ 10. Plaintiffs have alleged that all individual Defendants were acting under the color of state law and in their capacities as NYPD officials during the events in question. Compl. ¶¶ 8–10. Plaintiffs have sued all individual Defendants in both their individual and official capacities. *Id.*

Plaintiffs allege that while they were incarcerated at BCB, they were housed in cells that exposed and subjected them to a number of allegedly unconstitutional conditions. In particular, Plaintiffs allege the conditions at BCB were as follows:

- *Overcrowding* – Plaintiffs were held in jail cells with "numerous detainees in close proximity to one another . . . exacerbated by the loud noise, unsanitary conditions, lack of sleeping space and extreme temperatures[.]" Compl. ¶ 22.

---

[1] Within twenty-four hours, Plaintiffs were brought before a state judge for an arraignment, as required by New York law. *See* Compl. ¶ 19. N.Y. Crim. P. L. § 140.20 mandates that a detainee must be arraigned within 24 hours of being arrested.

- *Deprivation of Sleep* – Plaintiffs were held overnight and prevented from sleeping because they were not provided with any sleeping equipment[2]—including beds, cots, pillows, blankets, or bedding. Further, the lights were kept on at all times. Compl. ¶ 23.

- *Unusable Toilets* – The cells, which were already overcrowded, only contained one toilet per cell. That toilet was covered with feces, urine and/or vomit, lacked a toilet seat, was often clogged or backed-up, and lacked privacy partitions. Plaintiffs were typically provided with no toilet paper and, if a roll of toilet paper was provided, it was quickly extinguished. Compl. ¶ 24.

- *Extreme Temperatures and Poor Ventilation* – "Plaintiffs were subjected to extremely cold or hot temperatures, or both, and shivered and/or sweated profusely while in the unventilated cells in the facility." Compl. ¶ 25.

- *Sanitation and Garbage* – "Plaintiffs were held in cells in which there was garbage strewn over the floor as well as urine, feces and/or vomit splattered in sections of the floor." Compl. ¶ 26.

- *Infestation* – The cells were infested with rodents and/or insects. Compl. ¶ 27.

- *Crime* – "Plaintiffs were held in cells which were largely unsupervised and where the guards look[ed] the other way at fights, thefts and bullying. Violent criminals charged with such crimes as murder, attempted murder, armed robbery and rape [were] held in the same cells as alleged minor offenders and these criminals often

---

[2] Plaintiffs concede that they have observed a few other detainees sleep on the floor or a hard small bench. Compl. ¶ 23.

dominate[d] the other detainees and control[ed] what occur[ed] in the cells." Compl. ¶ 28.

- *Lack of Toiletries and Other Hygienic Items*: Plaintiffs were deprived of soap, tissues, clean water, toothbrushes, toothpaste, and toilet paper. Compl. ¶ 29.

- *Inadequate Water and Meals*: "Plaintiffs were not provided fresh, clean drinking water or adequate food." Plaintiffs were fed "one stale peanut butter and jelly or bologna sandwich, a carton of warm milk or juice and/or a small box of cereal, but were not given plastic utensils, paper plates or bowls, or napkins." Furthermore, Plaintiffs contend they could not consume the food because, compounded with the unusable toilets and lack of toilet paper described above, it was impossible for them to urinate or defecate. Compl. ¶ 30.

Plaintiffs allege that these conditions created a substantial risk of illness and physical harm. Compl. ¶ 31. Specifically, Plaintiffs allege that "(a) being in close proximity to numerous other detainees in overcrowded cells; (b) being exposed to insects and rodents, extreme temperatures, and unsanitary conditions including garbage, feces, urine and vomit; (c) being deprived of sleep, rest, adequate food, water, and the opportunity to clean themselves or wash their hands; and (d) being denied security and protection from other inmates by the municipal personnel employed" at BCB led to a substantial risk of harm or illness. *Id.* Additionally, Plaintiffs allege that when they would request medical treatment, the emergency medical technicians ("EMTs"), pursuant to a city policy, practice, or custom, dissuaded detainees from obtaining medical treatment by claiming that treatment would cause significant delays in the detainee being brought before a judge and potentially being released. *Id.*

Plaintiffs allege that Defendants, along with other New York City policymakers and supervisory personnel, have been aware of the unconstitutional conditions at the BCB since at least June 12, 2010. Compl. ¶ 32. Defendants were purportedly aware of the conditions from: their direct participation in the operation of the facility; their own observations; internal reports by municipal officials and employees; conversations with other municipal officials and employees; external reports and complaints (*i.e.* complaints from the Correctional Association of New York, the Legal Aid Society of New York, and Brooklyn Defender Services); complaints filed by detainees; reports by the media; and prior lawsuits.[3] Compl. ¶ 32. Nonetheless, Plaintiffs allege, Defendants and other city supervisory personnel failed to adequately investigate the conditions at BCB and failed to take effective remedial action. Compl. ¶ 34. Plaintiffs suggest numerous specific remedial actions that could have been taken to cure the alleged unconstitutional conditions. *See* Compl. ¶ 34. Plaintiffs further claim that the Defendants and other New York policymakers failed to adequately train, supervise, monitor, and discipline members of the NYPD and other municipal personnel who contributed to the conditions at BCB. Compl. ¶ 35.

According to Plaintiffs, by failing to adequately investigate or take effective remedial actions at BCB, the City of New York subjected Plaintiffs to a policy, practice, or custom of

---

[3] Plaintiffs point specifically to the lawsuits brought in this district, *Spinner, et al. v. City of New York, et al.*, 01-CV-2715, 01-CV-8264, 02-CV-2899, 02-CV-1039 (E.D.N.Y.) (Sifton, J.). The *Spinner* complaint alleged that: "While incarcerated at [BCB], plaintiffs and numerous other arrestees were held in filthy, disease-ridden, overcrowded jail cells. These jail cells have been infested with rodents and roaches for years. Moreover, there is often human feces and excrement on the floor and on the single toilet that the numerous arrestees in a cell are forced to share without privacy. The toilet is clogged and overflows onto the floor. Toilet paper and bedding are nonexistent. There is no access to clean drinking water. Temperatures are in the extremes. Milk is stored in a refrigerator that is labeled as containing 'biohazards.' There are health officials present in the facility advising the arrestees to be tested for tuberculosis once they are released. Violent criminals roam without supervision. The guards assigned to Central Booking look the other way at these dangerous conditions, and either ignore or utter profanities to arrestees who seek their assistance." Compl. ¶ 33.

unconstitutional conditions in violation of the Due Process Clause of the federal Constitution's Fourteenth Amendment. Compl. ¶ 36. Similarly, Plaintiffs claim that the individual Defendants' failure to adequately investigate or take effective remedial actions resulted in Plaintiffs being subjected to unconstitutional conditions at BCB, *i.e.* a failure to intervene claim. Compl. ¶¶ 37–38. Plaintiffs allege that they have "suffered emotional distress, extreme discomfort, pain, illness, physical injuries, sleep deprivation, nutritional deprivation and, in some cases, medical expenses" because of Defendants' conduct. Compl. ¶ 39.

## PROCEDURAL HISTORY

Plaintiffs filed the Original Complaint in this action on June 12, 2013, Dkt. 1, and the First Amended Complaint on August 7, 2013, Dkt. 7. The Second Amended Complaint was filed on September 12, 2013. Dkt. 10. Pursuant to a briefing schedule set by this Court, Defendants filed all papers in the pending motion to dismiss on December 20, 2013. *See* Minute Entry of 8/28/13; Dkts. 12–16. The motion has been under consideration since.

While the Second Amended Complaint sought class certification and injunctive relief, neither of those requests remain active in this litigation. In a letter to this Court on April 19, 2014, Plaintiffs' counsel stated its intent to withdraw the request for injunctive relief, without prejudice, citing the City of New York's current efforts to construct a new BCB facility. Dkt. 28. Plaintiffs' counsel reiterated this decision at a conference before the Court on May 7, 2014, and the Court considers any request for injunctive relief as moot at this juncture. *See* Minute Entry of 5/7/14. Furthermore, At the May 7 pre-motion conference, the Court set a briefing schedule, at Plaintiffs' request, for an anticipated Fed. R. Civ. P. 23 motion for class

certification. *See id.* The Court also set a summary judgment briefing schedule. *Id.*[4] On July 17, 2014, the Court received a letter from Plaintiffs' counsel informing the Court that Plaintiffs would no longer be seeking class certification. Dkt. 41. Accordingly, there will be no class certification in this action.

Additionally, two of the original plaintiffs—Nakaita Moore and Jahmel Lawyer—have entered into stipulations with the Defendants, so ordered by this Court, voluntarily dismissing all claims without prejudice under Fed. R. Civ. P. 41(a)(1)(A)(ii). *See* Dkt. 30–31.

## DISCUSSION

### A. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. A sufficiently pled complaint must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). If a complaint merely offers labels and conclusions, a formulaic recitation of the elements, or "naked assertions devoid of further factual enhancement," it will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). The Court must accept all factual allegations in the complaint as true, but is "not bound to accept as true legal

---

[4] United States Magistrate Judge Victor Pohorelsky has since amended that briefing schedule. *See* Minute Entry of 6/11/14. The motion for summary judgment will now be full briefed and submitted for review by January 9, 2015. *See id.*

conclusion couched as factual allegation," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Legal conclusions must be supported by factual allegations. *Iqbal*, 556 U.S. at 678; *Pension Ben. Guar.*, 712 F.3d at 717. Furthermore, the complaint must contain allegations that can support some recognized legal theory. *Spinale v. U.S. Dep't of Agric.*, 621 F. Supp. 2d 112, 119 (S.D.N.Y. 2009) (McMahon, J.) *aff'd sub nom.*, 356 F. App'x 465 (2d Cir. 2009). However, a complaint containing "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" will survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678. (citing *Twombly*, 550 U.S. at 556).

### B. Prison Litigation Reform Act

As a threshold matter, the parties dispute whether the Prison Litigation Reform Act ("PLRA") bars Plaintiffs from recovering compensatory damages. In relevant part, the statute states that "[n]o Federal civil action may be brought *by a prisoner confined in a jail, prison, or other correctional facility*, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e) (emphasis added). Defendants argue that the statute's prohibition applies here, even though the Plaintiffs were no longer incarcerated at the time they filed the suit. Plaintiffs argue that the limitation only applies to plaintiffs who are incarcerated at the time the action is commenced and thus does not affect this action.

The Second Circuit has not addressed this question and district courts in the Circuit have reached divergent conclusions. *Compare, e.g., In re Nassau Cnty. Strip Search Cases*, 99-CV-2844, 2010 WL 3781563, at *7 (E.D.N.Y. Sept. 22, 2010) (Hurley, J.) (holding that the PLRA only applies to plaintiffs who are incarcerated at the time an action is commenced) *with Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002) (Scheindlin, J.) *aff'd*, 56 Fed. App'x 43 (2d

Cir. 2003)[5] (holding that the PLRA bar applies to lawsuits brought by inmates regardless of whether the inmate is incarcerated at the time of filing or whether the plaintiff is subsequently paroled, sentenced, or released). For the well-articulated reasons in Judge Hurley's decision, this Court agrees with Plaintiffs' reading of the PLRA, adopts the analysis in *In re Nassau Cnty. Strip Search Cases*, and holds that the PLRA creates no bar to Plaintiffs' suit as they were no longer incarcerated at the time they filed this action.

The Court finds that the plain language of § 1997e(e) is particularly clear—its limitation is confined to "prisoners confined in a jail, prison, or other correctional facility." Certainly, if Congress intended to extend the reach of this section to cover inmates who have been released from incarceration, it would have chosen language indicating so. As the Second Circuit held when interpreting the exact same language in a different section of the PLRA: "[t]he reference to a prisoner's '*confine[ment] in] any jail, prison, or other correctional facility*' thus seems to describe the *status of a plaintiff at the time of filing*, not that of the plaintiff at some later time." *Perez. v. Westchester Cnty. Dep't of Corrs.*, 587 F.3d 143, 155 (2d Cir. 2009) (emphasis added) (holding that 42 U.S.C. §1997e(d)(1)'s attorney fee cap only applies to prisoners still incarcerated at the time of their case's resolution). That the district court in *In re Nassau Cnty. Strip Search Cases* was able to consider the Second Circuit's guidance in *Perez*, which was unavailable to the district court in *Cox*, speaks volumes in favor of the former's persuasiveness. Lastly, it is worth noting that at least two courts of appeals that have addressed this question have also found that the PLRA's damages limitation is inapplicable to plaintiffs who are not incarcerated at the time the action is filed. *See Harris v. Garner*, 216 F.3d 970, 979–80 (11th

---

[5] The Second Circuit's summary affirmance of the district court's order in *Cox* is neither persuasive nor binding on this Court. *See* 2d Cir. R. 32.1 (limiting the precedential value of summary orders).

Cir. 2000) (*en banc*); *Kerr v. Puckett*, 138 F.3d 321, 322–23 (7th Cir. 1998); *see also Byrne v. Trudell*, 12-CV-245, 2013 WL 2237820, at *25 (D. Vt. March 18, 2013) (Conroy, M.J.) ("[T]he Court must look to the status of the plaintiff *at the time he brings his suit*, rather than at the time of the alleged constitutional violations."), *report and recommendation adopted*, (D. Vt. May 21, 2013) (Murtha, J.); *McBean v. City of New York*, 260 F.R.D. 120, 142–43 (S.D.N.Y. 2009) (Lynch, J.); *Kelsey v. Cnty. of Schoharie*, 2005 WL 1972557, at *1–2 (N.D.N.Y. Aug. 5, 2005) (Hower, M.J.).

Accordingly, § 1997e(e) does not bar Plaintiffs, who were not incarcerated at the time they filed this action, from seeking any category of damages.

### C. Due Process

#### 1. Deliberate Indifference Standard

Pretrial detainees' constitutional rights are analyzed under the Fourteenth Amendment's Due Process Clause rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70 (2009). Due process guarantees that a pretrial detainee— an individual held "prior to an adjudication of guilt"—will not be subjected to conditions of detention that amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Walker v. Vargas*, 11-CV-9034, 2013 WL 4792765 (S.D.N.Y. Aug. 26, 2013) (Ramos, J.). "Pretrial detainees have not been convicted of a crime and thus 'may not be punished in any manner— neither cruelly and unusually nor otherwise.'" *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007) (quoting *Benjamin*, 343 F.3d at 49–50), *rev'd on other grounds sub nom., Iqbal*, 556 U.S. at 662. A detainee's rights are therefore "at least as great" as the Eighth Amendment protections available to a convicted prisoner. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

Nonetheless, the analysis for deliberate indifference is the same under the Fourteenth and Eighth Amendments. *See Caiozzo*, 581 F.3d at 72. To state a "claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).

"To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The Second Circuit has held "that prisoners may not be deprived of their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to their future health." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (internal citations omitted). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (internal citations omitted). "Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Walker*, 717 F.3d at 125 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

To satisfy the subjective prong, a complaint must allege that the defendant acted with "more than mere negligence." *Farmer*, 511 U.S. at 835. Deliberate indifference requires that "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57. "Evidence that a risk was 'obvious or otherwise must have

been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker*, 717 F.3d at 125 (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)). However, "an official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under [the] cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

## 2. Application

i. <u>Objective Prong</u>

As an initial matter, a significant issue of disagreement exists between the parties as to the effect of the Plaintiffs' twenty-four hour incarceration at the BCB. Defendants take the position that none of the alleged conditions at BCB could constitute a significantly serious deprivation because Plaintiffs were only confined for a maximum of twenty-four hours. Defendants come just shy of arguing for a *per se* rule that no matter the conditions, if a detainee is only exposed to them for less than 24 hours, there can be no objective constitutional violation. Plaintiffs argue that temporary and short-term conditions, if significantly serious, can nonetheless be unconstitutional.

Plaintiffs' position is correct. While "Defendants cite to cases when temporary deprivations did not create constitutional deprivations[, those] citations are not articulating a general rule; indeed, the length of the deprivation is not in itself dispositive . . . To the extent defendants argue that the temporary nature of the deprivation by itself warrants dismissal of [Plaintiffs'] complaint, without looking into what was deprived, they are incorrect." *Townsend v. Clemons*, 12-CV-03434, 2013 WL 818662, at *6 (S.D.N.Y. Jan. 30, 2013) (Netburn, M.J.), *report and recommendation adopted*, 2013 WL 868605 (S.D.N.Y. Mar. 4, 2013) (Sullivan, J.).

Turning to the objective element analysis, Plaintiffs have plausibly alleged that the conditions of confinement at BCB deprived them of the minimal civilized measures of life's

necessities and subjected them to unreasonable health and safety risks. *See Walker*, 717 F.3d at 126. Particularly when considering the various conditions in the aggregate, Plaintiffs have plausibly alleged that the deprivation they faced was sufficiently serious and failed to meet contemporary standards of decency. *See Jabbar*, 683 F.3d at 57. The Complaint contains specific examples of numerous conditions at the BCB that, even for a period of twenty-four hours, would deprive a pretrial detainee of, at least, one basic human need. *See* Compl. ¶¶ 22–30. The alleged combination of overcrowded cells, exposure to insects, rodents, extreme temperatures, and unsanitary conditions (including garbage, feces, urine, and vomit), sleep deprivation, the lack of adequate food and water, the inability to clean themselves, the lack of access to usable bathroom facilities, and the lack of protection from the crimes and conduct of other inmates put Plaintiffs at risk of serious physical harm as well as present and future illness. Our Constitution and societal standards require more, even for incarcerated individuals, and especially for pretrial detainees who cannot be punished by the state.

Indeed, each of the alleged unconstitutional conditions raised in the Complaint has been found to be a potentially viable constitutional violation. The Second Circuit has recently held that the following conditions can be found to objectively deprive detainees of basic human needs and violate due process: exposure to extreme temperatures without proper ventilation; deprivation of sleep; egregiously unsanitary cell conditions;[6] failure to provide toiletries, especially toilet paper;[7] situations in which prisoners are at substantial risk of serious harm from

---

[6] *See LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972) ("Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted.").

[7] *See Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("[T]his court and other circuits have recognized that deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement . . . .").

other inmates; and overcrowding, particularly if combined with other adverse conditions.[8] *Walker*, 717 F.3d at 126–29 (collecting cases). Furthermore, depriving an incarcerated individual the ability "to eat, drink, or use the bathroom" for several hours is sufficient to state a claim for deliberate indifference. *See Boadi v. City of New York*, 12-CV-2456, 2012 WL 3062063, at *4 (E.D.N.Y. July 26, 2012) (Cogan, J.).

In light of these principles and construing the allegations in the light most favorable to Plaintiffs, as we must, Plaintiffs adequately alleged objectively serious conditions depriving them of basic human needs, including food, a habitable temperature, sleep, and the ability to relieve oneself without exposure to other human excrement, among others. Even in a twenty-four hour period, the combination of conditions alleged by Plaintiffs are so repulsive to a civilized society's minimal standards of decency that they can be found to violate due process.

  ii. <u>Subjective Prong</u>

When construed in light most favorable to Plaintiffs, the Complaint adequately alleges, with specific factual allegations, that the individual Defendants knew of and disregarded the excessive risks to Plaintiffs' health and safety while Plaintiffs were incarcerated at BCB. Plaintiffs allege that since at least June 12, 2010, the individual Defendants, and in effect the City of New York, were aware of all of the alleged conditions at BCB. Compl. ¶¶ 32–33. Plaintiffs specifically state in the Complaint that the Defendants were aware of the conditions from: their direct participation in the operation of the facility; their own observations; internal reports by municipal officials and employees; conversations with other municipal officials and employees; external reports and complaints; complaints filed by detainees; reports by the media;

---

[8] The constitutional standard for overcrowding fluctuates depending on the existence and extent of other aggravating adverse conditions. *See Walker*, 717 F.3d at 128 (citing *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998)).

and prior lawsuits. Compl. ¶ 33. Despite this actual notice of the conditions at BCB, Plaintiffs allege that the Defendants neither investigated nor took effective remedial action. Compl. ¶ 34.

In light of the specific allegations of Defendants' deliberate indifference to the conditions at BCB, Plaintiffs have adequately stated a claim under the second prong of the due process analysis. *See Walker*, 717 F.3d at 130 (plaintiff's allegations that he directly spoke to defendants about conditions and that certain defendants directly witnessed conditions were sufficient to satisfy deliberate indifference on motion to dismiss); *see also Gatson v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (asserting that defendant prison guards "made daily rounds of SHU" was sufficient to allege that defendants had actual knowledge of obvious inhumane conditions).

### 3. Punitive Intent

As pretrial detainees, Plaintiffs may also establish liability under the Due Process Clause if they were "punished in any matter." *Benjamin*, 343 F.3d at 49–50. If the conditions of Plaintiff's confinement render it punitive, Defendants face § 1983 liability. *See Iqbal*, 490 F.3d at 168. "A condition of confinement that is 'not reasonably related to a legitimate government objective' supports an inference of a punitive intent." *Smart v. City of New York*, 08-CV-2203, 2009 WL 862281, at *9 (S.D.N.Y. Apr. 1, 2009) (Baer, J.) (quoting *Iqbal*, 490 F.3d at 168). "Absent an express intent to punish, whether conditions of detention 'appears excessive in relation to the alternative purpose assigned [to it],' is also relevant to whether it is punitive in nature." *Id.* (quoting *Bell*, 441 U.S. at 538).

Read in the light most favorable to Plaintiffs, the Complaint adequately alleges that the NYPD officials consistently disregarded substantial issues brought to their attention regarding the inhumane conditions at BCB and consciously chose to allow those conditions to continue. *See* Compl. ¶¶ 33–34. The various means through which Defendants were allegedly made aware

of the conditions at BCB—which exclusively held pretrial detainees—and the subsequent failure to investigate or remedy the claims are sufficient allegations to state a claim of express punitive intent, or, at the very least, that the conditions at BCB were not reasonably related to a legitimate government objective. *See Smart*, 2009 WL 862281, at *10 (consistent disregard of repeated requests for food, water, and use of restroom, could reasonably be found to infer a punitive intent or be found not reasonably related to a legitimate government purpose). Accordingly, the Complaint adequately alleges facts that support a plausible inference of punitive intent on behalf of the individual Defendants. *See id.* (collecting cases).

### D. Personal Involvement of the Individual Defendants

Defendants have moved to dismiss the claims against the individual Defendants on the theory that Plaintiffs have not sufficiently alleged the individual Defendants' personal involvement in the purported constitutional violations. Defendants argue that in the wake of the Supreme Court's decision in *Iqbal*, Plaintiffs must allege active conduct on the part of the individual Defendants in order to state a claim against the state officials in their individual capacity. *See* 556 U.S. at 676. In response, Plaintiffs argue that while *Iqbal* may have heightened the requirements for § 1983 supervisory liability, the five theories of personal involvement that the Second Circuit recognized in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), remain good law.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Hernandez v. Kane*, 341 F.3d 137, 144–45 (2d Cir. 2003). In *Colon*, the Second Circuit articulated five avenues through which a defendant may be shown to have been personally involved in a constitutional violation:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873.

Defendants contend that *Iqbal* abrogated these categories. Defendants cite to a number of cases in which district courts have read *Iqbal* to eviscerate all but the first and part of the third *Colon* categories. *See, e.g., Bellamy v. Mount Vernon Hosp.*, 07-CV-1801, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009) (Scheindlin, J.), *aff'd*, 387 F. App'x 55, 56–57 (2d Cir. 2010).[9] Those courts have found that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate." *Id.* at *6.

However, neither the Second Circuit nor the Supreme Court has endorsed this reading of *Iqbal*. In fact, the Second Circuit has explicitly declined to resolve the issue in recent decisions. *See Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations") (citations omitted); *Grullon*, 720 F.3d at 138 (same). Furthermore, the majority of district courts in this Circuit that have addressed the question have found that "absent any contrary directive from the Second Circuit, all five *Colon* factors survive[.]" *Vazquez–Mentado v. Buitron*, 12-CV-0797, 2014 WL 318329, at *2 (N.D.N.Y. Jan. 29, 2014) (Kahn, J.) (collecting cases); *see also Phillip v.*

---

[9] *See supra* n.5.

*Schriro*, 12-CV-8349, 2014 WL 4184816, at *4 (S.D.N.Y. Aug. 22, 2014) (Abrams, J.); *Qasem v. Toro*, 737 F. Supp. 2d 147, 151–52 (S.D.N.Y. 2010) (Stein, J.). "While it is true that *Iqbal* reinforces the well-established rule in this Circuit that *respondeat superior* does not apply to § 1983 claims . . . '*Colon*'s bases for liability are not founded on a theory of *respondeat superior*, but rather on a recognition that personal involvement of defendants in alleged constitutional deprivation can be shown by nonfeasance as well as misfeasance.'" *Phillip*, 2014 WL 4184816, at *4 (quoting *Qasem*, 737 F. Supp. 2d at 151–52) (internal citations omitted). "Therefore, unless or until the Second Circuit or Supreme Court rule otherwise, this Court agrees with the courts that have held that the *Colon* factors 'still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.'" *Id.* (quoting *Qasem*, 737 F. Supp. 2d. at 152).

Here, Plaintiffs adequately allege that each of the individual Defendants was made aware of the alleged unconstitutional conditions at BCB, yet did nothing in response. *See* Compl. ¶¶ 34–35. At the very least, this provides evidence that the Defendants either "failed to remedy the wrong" despite "being informed of the violation through a report or appeal" or "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. Furthermore, there is a strong inference arising from the Complaint that the individual Defendants were "grossly negligent in supervising subordinates who committed the wrongful acts" by failing to adequately train, supervise, monitor, or discipline the personnel who oversaw the conditions at the BCB. *Id.* Lastly, giving all favorable inferences to Plaintiffs, they have adequately alleged that in operating the BCB under the alleged conditions for a number of years, the individual Defendants "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Id.*

In sum, there are sufficient allegations in the Complaint of personal involvement on the part of the individual Defendants to allow this § 1983 action to continue against them in their individual capacities.

## CONCLUSION

While a further developed factual record may ultimately show that Plaintiffs' Fourteenth Amendment rights were not violated, the Second Amended Complaint plausibly alleges objectively serious conditions at the BCB that, if true, deprived Plaintiffs of "the minimal civilized measure of life's necessities." *See Walker*, 717 F.3d at 129.

Accordingly, Defendants' Motion to Dismiss is DENIED. Plaintiffs' individual claims for compensatory damages for the alleged unconstitutional conditions that they endured at Brooklyn Central Booking shall proceed consistent with this Opinion.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: September 12, 2014
Brooklyn, New York