UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GERMAIN CANO, ERIC CEPHUS, KEVIN DARNELL,  :
PETER EPPEL, MICHAEL GLENN, DEBORAH        
GONZALEZ, TRAVIS GORDON, JACQUELINE      :
GUARINO, KEITH JENNINGS, WESLEY JONES,  
GREGORY MAUGERI, MICHAEL MCGHEE,     
DMITRIY MILOSLAVSKIY, YVONNE MIND,    :
STEVEN MODES, KERRY SCOTT, PHILLIP     
SINGLETON, MICHAEL SPALANGO, RAYMOND  :
TUCKER, NANCY VIGLIONE, ELLI VIKKI,     
individually and on behalf of a class of all others similarly :
situated,

                           Plaintiffs,      :

   -against-

THE CITY OF NEW YORK, POLICE             :
COMMISSIONER RAYMOND KELLY, FIRST    
DEPUTY COMMISSIONER RAFAEL PINEIRO,  :
CAPTAIN KENNETH KOBETITSCH, CAPTAIN 
WILLIAM TOBIN,
                      Defendants.     :
------------------------------------------------------------------X

                 <u>DECISION AND ORDER</u>
                 13-cv-3341 (WFK) (VVP)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Plaintiffs Germain Cano, Eric Cephus, Kevin Darnell, Michael Glenn, Deborah Gonzalez, Travis Gordon, Jacqueline Guarino, Keith Jennings, Wesley Jones, Gregory Maugeri, Michael McGhee, Dmitriy Miloslavskiy, Yvonne Ming, Steven Modes, Kerry Scott, Phillip Singleton, Michael Spalango, Raymond Tucker, Nancy Viglione, and Elli Vikki (collectively, "Plaintiffs") bring this action seeking compensatory damages for the allegedly unconstitutional prison conditions they endured while detained at Brooklyn Central Booking ("BCB"). Plaintiffs claim the City of New York, First Deputy Rafael Pineiro, Captain Kenneth Kobetitsch, and Captain William Tobin (collectively, "Defendants") were deliberately and punitively indifferent to a serious risk of harm Plaintiffs faced at BCB in violation of their rights under the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Currently before this Court is Defendants' motion for summary judgment to dismiss the action. For the reasons that follow, Defendants' motion is GRANTED in its entirety.

## BACKGROUND

    The following facts are either undisputed or described in the light most favorable to

Plaintiffs, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d

Cir. 2005).

**BCB**

BCB is a facility in New York City that temporarily houses individuals who have been arrested by the New York Police Department in Brooklyn, New York and are awaiting arraignment before a Criminal Court judge.  Dkt. 70 (Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts) ("DSF") at ¶ 1.  At all times relevant to the allegations in this action, BCB was located on the ground floor of the Brooklyn House of Detention, a correctional facility located at 272 Atlantic Avenue, Brooklyn, New York 11201.  *Id.* at ¶ 2.

**The Plaintiffs**

Plaintiffs allege that they were arrested on one or more occasions in Brooklyn between July 10, 2011 and July 23, 2013.  *Id.* at ¶ 3.  Plaintiffs were in custody at BCB during the following months: (1) July 2011, (2) October 2011, (3) November 2011, (4) January 2012, (5) May 2012, (6) July 2012, (7) September 2012, (8) October 2012, (9) December 2012, (10) January 2013, (11) February 2013, (12) March 2013, (13) April 2013, (14) May 2013, (15) June 2013, and (16) July 2013.  *Id.*  Following their arrests, each Plaintiff spent an average of ten to twenty-four hours in custody at BCB.  *Id.* at ¶ 4.  No Plaintiff spent longer than a consecutive day at BCB.  *Id.* at ¶ 4.

**Detention Conditions**

Plaintiffs allege that while they were detained at BCB, they were housed in cells that exposed and subjected them to a number of allegedly unconstitutional conditions such as:

- Overcrowding:  Plaintiffs were held in jail cells with "numerous detainees in close proximity to one another.  The overcrowding was exacerbated by the loud noise, unsanitary conditions, lack of sleeping space[,] and extreme temperatures[.]"  Dkt. 10 ("Complaint") at ¶ 22.

- Deprivation of Sleep:  Plaintiffs were held overnight and prevented from sleeping because they were not provided with any sleeping equipment — including beds, cots, pillows, blankets, or bedding.  Further, the lights were kept on at all times. *Id.* at ¶ 23.

- Unusable Toilets:  The cells, which were already overcrowded, only contained one toilet per cell.  That toilet was covered with feces, urine and/or vomit, lacked a toilet seat, was often clogged or backed-up, and lacked privacy partitions. Plaintiffs were typically provided with no toilet paper or, if a roll of toilet paper was provided, it was quickly used up.  *Id.* at ¶ 24.

- Extreme Temperatures and Poor Ventilation:  "Plaintiffs were subjected to extremely cold or hot temperatures, or both, and shivered and/or sweated profusely while in the unventilated cells in the facility."  *Id.* at ¶ 25.

- Sanitation and Garbage:  "Plaintiffs were held in cells in which there was garbage strewn over the floor as well as urine, feces[,] and/or vomit splattered in sections of the floor."  *Id.* at ¶ 26.

- Infestation:  The cells were infested with rodents and/or insects.  *Id.* at ¶ 27.

- Crime:  "Plaintiffs were held in cells which were largely unsupervised and where the guards look[ed] the other way at fights, thefts[,] and bullying. Violent criminals charged with such crimes as murder, attempted murder, armed robbery[,] and rape [were] held in the same cells as alleged minor offenders and these criminals often dominate[d] the other detainees and control[led] what occur[ed] in the cells."  *Id.* at ¶ 28.

- <u>Lack of Toiletries and Other Hygienic Items:</u>  Plaintiffs were deprived of soap, tissues, clean water, toothbrushes, toothpaste, and toilet paper.  *Id.* at ¶ 29.

- <u>Inadequate Water and Meals:</u>  "Plaintiffs were not provided fresh, clean drinking water or adequate food."  *Id.* at ¶ 30.  Plaintiffs were fed "one stale peanut butter and jelly or bologna sandwich, a carton of warm milk or juice and/or a small box of cereal, but were not given plastic utensils, paper plates or bowls, or napkins."  *Id.*

Based on the foregoing conditions, Plaintiffs claim they were exposed to a substantial risk of illness and physical harm.  *Id.* at ¶ 31.

**Current Action**

On September 12, 2013, Plaintiffs filed a Second Amended Complaint against Defendants alleging that their constitutional rights were violated under the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.  *See* Complaint.  Plaintiffs have alleged that Defendants First Deputy Commissioner Rafael Pineiro, Captain Kenneth Kobetitsh, and Captain William Tobin (collectively, the "Individual Defendants") were acting under the color of state law and in their capacities as NYPD officials during the events in question.  *Id.* at ¶¶ 8–10. Plaintiffs have sued the Individual Defendants in both their individual and official capacities.  *Id.* According to Plaintiffs, Defendants, along with other New York City policymakers and supervisory personnel, have been aware of the unconstitutional conditions at the BCB since at least June 12, 2010.  *Id.* at ¶ 32.

Before this Court is Defendants' motion for summary judgment to dismiss the Second Amended Complaint.  Dkt. 69 ("Memo in Support").  Defendants argue summary judgment is appropriate because: (1) Plaintiffs have failed to state a cognizable constitutional claim, (2) the Individual Defendants are entitled to qualified immunity, (3) Defendant Rafael Pineiro had no

—4—

personal involvement in the alleged violations, and (4) Plaintiffs cannot establish a § 1983 claim against the City of New York because Plaintiffs have not been deprived of any federal rights and because there is no evidence in the record to support a *Monell* claim. *Id.* at 3-25. Plaintiffs oppose Defendants' motion on all grounds. Dkt. 73 ("Memo in Opp."). After setting forth the relevant legal standards governing motions for summary judgment, the Court will address each issue raised by the parties.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a motion for summary judgment,"[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citations omitted). Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

The non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

## II.  Analysis

### A.  Plaintiffs' Constitutional Claims Do Not Rise to Deliberate Indifference

Defendants argue that summary judgment is appropriate because Plaintiffs have failed to state a cognizable claim to support their allegations that they were subjected to unconstitutional conditions while detained at the BCB.  Memo in Support at 3-19.

Pretrial detainees' constitutional rights are analyzed under the Fourteenth Amendment's Due Process Clause rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009).  Due Process guarantees that a pretrial detainee – an individual held "prior to an adjudication of guilt" – will not be subjected to conditions of detention that amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535-7 (1979); *see also Walker v. Vargas*, 11-CV-9034, 2013 WL 4792765, at *7 (S.D.N.Y. Aug. 26, 2013) (Ramos, J.).  "Pretrial detainees have not been convicted of a crime and thus 'may not be punished in any manner – neither cruelly and unusually nor otherwise.'" *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007) (quoting *Benjamin*, 343 F.3d at 49-50), *rev'd on other grounds sub nom.*, *Ascroft v. Iqbal*, 556 U.S. 662 (2009).  A detainee's rights are therefore "at least as great" as the Eighth Amendment protections available to a convicted prisoner. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  As such, the analysis is the same under the Fourteenth and Eighth Amendments. *See Caiozzo*, 581 F.3d at 72 ("For purposes of measuring constitutional duties, our case law and the teachings of the Supreme Court indicate that there is no legally

—6—

significant situation in which a failure to provide an incarcerated individual with [constitutional rights] *is* punishment yet *is not* cruel and unusual.").

To prevail on a claim based on constitutionally inadequate conditions of confinement, a detainee must establish deliberate indifference. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). To satisfy the requirements of deliberate indifference, a detainee must allege that "(1) objectively, the deprivation the [detainee] suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . . , such as deliberate indifference to [detainee] health or safety.'" *Id.* (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).

Here, Plaintiffs allege that while they were detained at BCB, they were subjected to the following unconstitutional conditions of confinement: (1) overcrowding, (2) deprivation of sleep, (3) unusable toilets, (4) extreme temperatures and poor ventilation, (5) poor sanitation and garbage, (6) infestation, (7) crime, (8) lack of toiletries and other hygienic items, and (9) inadequate water and nutrition. Memo in Opp. at 5-8. Defendants argue that Plaintiffs cannot meet the deliberate indifference standard since "none of Plaintiff's allegations rises to the level of a viable constitutional claim, because there are no facts in the record that could plausibly establish they were denied basic human needs or were exposed to conditions that posed an unreasonable risk of serious damage to their future health, nor have they plausibly alleged that any official acted with a culpable state of mind." Memo in Support at 4 (internal quotation marks, citations, and alterations omitted). Defendants are correct.

### 1. Plaintiffs Fail to Satisfy the Objective Prong

First, with respect to the objective prong, although Plaintiffs complain of overcrowding, deprivation of sleep, unusable toilets, extreme temperatures and poor ventilation, poor sanitation and garbage, infestation, crime, lack of toiletries and other hygienic items, and inadequate water

and nutrition while in custody at BCB, Plaintiffs only complain of such issues for a short period

of time – an average of ten to twenty-four hours – with nothing more.  DSF at ¶ 4.

Under the objective prong, a detainee "must show that the conditions, either alone or in

combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at

125 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  The Second Circuit has "held that

prisoners may not be deprived of their basic human needs – *e.g.*, food, clothing, shelter, medical

care, and reasonable safety – and they may not be exposed to conditions that pose an

unreasonable risk of serious damage to their future health." *Jabbar v. Fischer*, 683 F.3d 54, 57

(2d Cir. 2012) (internal quotation marks and citations omitted).  "[T]here is no static test to

determine whether a deprivation is sufficiently serious; the conditions themselves must be

evaluated in light of contemporary standards of decency." *Id.*  (internal quotation marks and

citations omitted).  "Moreover, conditions of confinement may be aggregated to rise to the level

of a constitutional violation, but 'only when they have a mutually enforcing effect that produces

the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Walker*,

717 F.3d at 125 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

"But the Constitution does not mandate comfortable prisons[.]" *Rhodes*, 452 U.S. at 349.

The Second Circuit and her constituent District Courts have routinely held that occasional and

temporary deprivations of sanitary and temperate conditions, *without more*, do not constitute a

sufficiently serious deprivation under the Eighth Amendment to constitute punishment. *See, e.g.*,

*Wang v. Vahldieck*, 09-CV-3783, 2012 WL 119591, at *9 (E.D.N.Y. Jan. 9, 2012) (Ross, J.)

("[T]emporary or limited exposure to unsanitary conditions fails to state an injury of

constitutional magnitude.") (internal citation omitted); *Ortiz v. Dep't of Corr. of City of New*

*York*, 08-CV-2195, 2011 WL 2638137, at *7, *9 (S.D.N.Y. Apr. 29, 2011) (Pitman, Mag. J.)

(exposure to sewage overflows in which no exposure lasted for an entire day did not violate

Eighth Amendment because where "exposure to such waste is intermittent or limited to a matter of hours, courts normally will not entertain such actions."), *adopted sub nom. Ortiz v. Hernandez*, 2011 WL 2638140, at *3 (S.D.N.Y. July 5, 2011) (Sullivan, J.); *Beckford v. New York State Office of Mental Health*, 06-CV-00561, 2010 WL 1816689, at *12 (W.D.N.Y. May 3, 2010) (Schroeder, Jr., Mag. J.) ("Indeed, courts within the Second Circuit have routinely held that the type of deprivations at issue here, no access to water and electricity for twenty-two hours, do not constitute an Eighth Amendment violation.") (internal citations omitted); *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001) (Scheindlin, J.) (noting factor to consider when determining Eighth Amendment violation is duration of the deprivation, and noting it must be for "a substantial period of time"); *Fisher v. Dep't of Corr.*, 92-CV-6037, 1995 WL 608379, at *5 (S.D.N.Y. Oct. 16, 1995) (Preska, J.) (prison's failure to provide inmate with toothpaste and soap for eight consecutive days, lighting for twenty days, and hot food "65 percent of the [t]ime" did not rise to level of Eighth Amendment violation).

As detailed below, while certain conditions may have been uncomfortable for Plaintiffs, the evidence fails to establish any Plaintiff was regularly denied his or her basic human needs or was exposed to conditions that posed an unreasonable risk of serious damage to his or her future health.

### a. Overcrowding

Plaintiffs allege they were held in jail cells with "numerous detainees in close proximity to one another. The overcrowding was exacerbated by the loud noise, unsanitary conditions, lack of sleeping space[,] and extreme temperatures[.]" Complaint at ¶ 22. However, there is nothing in the record to support any of Plaintiffs' allegations that overcrowding was an unconstitutional condition of confinement. While many Plaintiffs complain the cells were

overcrowded, their individual complaints are insufficient to establish a constitutional deprivation because they involve nothing more, *i.e.*, Plaintiffs fail to show any of them were subjected to overcrowding for an extended period of time and further fail to establish any of them were injured in any way from the overcrowding. *See, e.g., Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir. 1981) (refusing to find overcrowding rises "to the level of punishment when imposed for a short period of time"); *see also* Dkt. 77 (Declaration of Michael Hueston) ("Hueston Dec."), Ex. 1 at PDF 25-26, Ex. 2 at PDF 40, and Ex. 4 at PDF 26. As Federal Rule of Civil Procedure 56 makes clear, where a motion for summary judgment is properly made and supported, the opposing party must rely on supported factual positions to show there is a genuine issue of material fact for trial – merely relying on allegations is insufficient to create a genuine issue of material fact. Fed. R. Civ. P. 56. Because Plaintiffs have failed to create a triable issue of material fact on this issue by failing to provide evidence in support of the allegations, summary judgment is appropriate.

### b.  Deprivation of Sleep

Plaintiffs allege that they were held overnight and prevented from sleeping because they were not provided with any sleeping equipment – including beds, cots, pillows, blankets, or bedding. Complaint at ¶ 23. Further, the lights were kept on at all times. *Id.* However, "it is well settled that a temporary delay in providing clean bedding—or even the failure to provide any bedding at all, for a period of time less than one full day in duration—does not rise to the level of a constitutional violation." *Lewis v. Zon*, 920 F. Supp. 2d 379, 390 (W.D.N.Y. 2013) (Larimer, J.) (internal citation omitted). Here, as previously mentioned, no Plaintiff spent more than one twenty-four hour consecutive period at BCB. *See* Complaint. As such, none of the Plaintiffs can claim a constitutional deprivation based on lack of sleep or sleeping material.

Further, notably missing from the record is any evidence to support Plaintiffs' allegations that lack of sleep exposed any Plaintiff to an unreasonable risk of damage to their health or that the failure to *regularly* provide any Plaintiff with sleeping equipment deprived any Plaintiff a basic human need. Even though many Plaintiffs complain they could not sleep, their complaints do not establish anything more, which is necessary for a constitutional deprivation, *i.e.*, none of the Plaintiffs establish any one of them was deprived sleep for an extended period of time nor do any of the Plaintiffs establish that lack of sleep injured any one of them in any way. *See, e.g.*, Hueston Dec., Ex. 4 at PDF 59, Ex. 6 at PDF 39-40, Ex. 7 at PDF 39, Ex. 8 at PDF 30, and Ex. 11 at PDF 28-29.

Moreover, according to Defendant Tobin, "[s]hould an individual wish to sleep during their stay at BCB, they are provided with padded sleeping mats and a blanket *upon request*." Dkt. 72 ("Tobin Declaration") at ¶ 60 (emphasis added). However, no Plaintiff ever requested a sleeping mat or blanket. *See, e.g.*, Hueston Dec., Ex. 5 at PDF 28.

As stated above, Plaintiffs cannot rely on their allegations to create a genuine issue of material fact at the summary judgment stage. *See* Fed. R. Civ. P. 56. Accordingly, summary judgment is appropriate on this issue.

### c.  Unusable Toilets

Plaintiffs allege that they were unconstitutionally deprived the use of toilets because the toilets only contained one toilet per cell. Complaint at ¶ 24. Moreover, Plaintiffs claim that the toilets were covered with feces, urine and/or vomit, lacked a toilet seat, was often clogged or backed-up, and lacked privacy partitions. *Id.* However, the uncontroverted evidence establishes that no Plaintiff was *regularly* deprived access to a toilet.

For example, Plaintiff Cano testified that while there was a toilet, he didn't use the toilet because he was "told not to," and because he believed he would get out of the BCB "fast enough." Hueston Dec., Ex. 1 at PDF 33. Ultimately, Plaintiff Cano did not use the toilet because he "didn't feel comfortable," not because he was denied access to a toilet. *Id.* at PDF 39. Likewise, Plaintiffs Michael Glenn and Deborah Gonzalez testified that they did not use the toilet because it was "filthy" and "dirty," not because they were denied access to a toilet. Hueston Dec., Ex. 4 at PDF 35; Hueston Dec., Ex. 5 at PDF 29-30. Similarly, Plaintiff Wesley Jones stated that he didn't use the toilet at BCB because "there was a lot of stuff on [his] mind" – not because he was denied access to a toilet. Hueston Dec., Ex. 9 at PDF 21.

Plaintiff Kevin Darnell testified that he had access to a toilet and was able to urinate during his time at BCB. Hueston Dec., Ex. 3 at PDF 31. While he claimed he suffered from "emotional scars" because of the "traumatic" experience, he suffered no physical harm and did not provide any testimony as to how his health has suffered as a result of the "traumatic experience." *Id.* Plaintiff Travis Gordon initially thought he could not flush the toilet because it was overflowing with urine and feces, but eventually used the toilet and did have access to toilet paper during his stay at BCB. Hueston Dec., Ex. 6 at PDF 36, 55, 68. Plaintiff Keith Jennings also had access to a toilet but chose not to use the toilet. Hueston Dec., Ex. 8 at PDF 30, 43-44. He also had access to toilet paper. *Id.* at PDF 30. Plaintiff Dmitriy Miloslavskiy stated that he did not use the toilet because he would not be able to wash his hands before and after. Hueston Dec., Ex. 12 at PDF 74. He testified that he continued to have headaches and felt sick for a week after being released from the BCB and saw a physician, but did not testify as to what the physician concluded or if he suffered any danger to his health as result of any of the conditions at BCB. *Id.* at PDF 45.

Because the evidence does not establish that any one Plaintiff was *regularly* deprived use of a toilet, but instead establishes only that Plaintiffs were simply offered toilets in "a less-than-ideal" form, no constitutional deprivation could have occurred. *See Myers v. City of New York*, No. 11-CV-8525, 2012 WL 3776707, at *7 (S.D.N.Y. Aug. 29, 2012) (Engelmayer, J.) *aff'd*, 529 F. App'x 105 (2d Cir. 2013).  Accordingly, summary judgment on this issue is appropriate.

### d.  Extreme Temperatures and Poor Ventilation

Plaintiffs allege they were "subjected to extremely cold or hot temperatures, or both, and shivered and/or sweated profusely while in the unventilated cells in the facility."  Complaint at ¶ 25.  However, the Second Circuit and our sister District Courts have routinely held that temporary exposure to extreme temperatures does not amount to a constitutional violation.  For example, in *Myers*, the District Court for the Southern District of New York stated that "[w]hile it may have been uncomfortable for [detainee] to be held in a warm room without air-conditioning for 16 hours, it does not rise to the level of a constitutional violation . . . [d]iscomfort of this short duration does not rise to the level of a constitutional violation."  2012 WL 3776707, at *7 (internal citation omitted); *see also Trammell v. Keane*, 338 F.3d 155, 164-65 (2d Cir. 2003) (collecting cases where prolonged period of exposure to bitter cold for a number of months were found sufficient to potentially establish Eighth Amendment violation, but distinguishing those cases from ones with shorter periods of exposure); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 357 (N.D.N.Y. 2010) (Hurd, J.) (adopting Report and Recommendation of Magistrate Judge George H. Lowe) ("Where an inmate has not been subjected to 'bitter cold' for

a 'prolonged period [such as a few weeks],' the Second Circuit has held that summary judgment for prison officials is appropriate.") (internal citation omitted).

Here, as previously stated, not a single Plaintiff was held at BCB for more than a twenty-four hour consecutive period.  As such, there is no evidence to establish that any of the Plaintiffs were *regularly* exposed to bitter cold or extreme heat to establish a constitutional deprivation. Moreover, there is nothing in the record to suggest that extreme temperatures and poor ventilation posed an unreasonable risk of damage to Plaintiffs' health.  While Plaintiffs complain they were either too hot or too cold during their stay at BCB, their complaints do not establish anything more to suggest a constitutional deprivation, *i.e.*, that they were too hot or too cold for a sufficiently extended period of time or that the allegedly extreme temperatures and poor ventilation injured their future health in any way.  *See, e.g.*, Hueston Dec., Ex. 4 at PDF 40, Ex. 5 at PDF 30-31, and Ex. 14 at PDF 54.  It is also worth noting that one Plaintiff even went as far as to acknowledge that officers, who work on a daily basis at BCB, are subjected to the same conditions as Plaintiffs were, but the officers do not complain about those conditions.  *See, e.g.*, Hueston Dec., Ex. 18 at PDF 35.  Based on this record, there is no evidence to create a triable issue of fact on this issue.  Therefore, summary judgment is warranted.

### e.  Poor Sanitation and Garbage

Plaintiffs claim they "were held in cells in which there was garbage strewn over the floor as well as urine, feces[,] and/or vomit splattered in sections of the floor."  Complaint at ¶ 26. Despite these allegations, the record presented to this Court does not establish a constitutional deprivation.  Generally, limited exposure to unsanitary conditions is not sufficient to establish a constitutional deprivation.  *See Wang*, 2012 WL 119591, at *9.  Courts typically only allow such a claim to proceed where severe facts are presented.  For example, in *Gaston*, 249 F.3d at 165,

the Second Circuit found that the district court improperly dismissed plaintiff's claims on summary judgment where plaintiff was exposed to a months' long period of bitter cold, with "mice . . . constantly entering his cell[,]" and "for several consecutive days and one noncontiguous day in July 1990, the area directly in front of [plaintiff's] cell was filled with human feces, urine, and sewage water." The facts presented in *Gatson* are nowhere close to the facts presented in this case.

Here, not a single Plaintiff was exposed to urine, feces, and/or vomit for anything more than a limited period of time because no Plaintiff was held at BCB for more than one twenty-four hour period. Moreover, there is nothing in the record to show that that the alleged issues with poor sanitation and garbage posed an unreasonable risk of damage to any of the Plaintiffs' future health. While Plaintiffs complain about the conditions, they do nothing more than simply state the conditions. *See, e.g.*, Hueston Dec., Ex. 4 at PDF 26, Ex. 5 at PDF 30, and Ex. 20 at PDF 79. Without anything more, none of the Plaintiffs can establish a constitutional deprivation. *See, e.g.*, *Wang*, 2012 WL 119591, at *9. Because Plaintiffs were only exposed for a limited period of time to poor sanitation and are unable to establish anything more about the severity of the conditions, summary judgment on this issue is warranted.

### f.  Infestation

Plaintiffs allege that the cells within BCB were infested with rodents and/or insects. Complaint at ¶ 27. Once again, the record is devoid of any evidence to suggest that any of the Plaintiffs were regularly exposed to infestation or that infestation posed an unreasonable risk of damage to any of the Plaintiffs' health. As previously mentioned, not a single Plaintiff spent more than a consecutive twenty-four hour period at BCB. Moreover, those Plaintiffs who complain of an infestation merely state that they saw roaches, insects, flies, and mice. They do

not state anything more.  *See, e.g.*, Hueston Dec., Ex. 2 at PDF 38-39, Ex. 3 at PDF 37, Ex. 5 at PDF 33, and Ex. 8 at PDF 24.  "[T]he mere presence of vermin in a prisoner's housing area does not constitute punishment under the Eighth Amendment." *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (Chin, J) (internal quotation marks and citation omitted).  As such, Plaintiffs' evidence is insufficient to establish a constitutional deprivation under the objective prong.  *See, e.g.*, *Wang*, 2012 WL 119591, at *9.  Accordingly, summary judgment is appropriate on this issue.

### g.  Crime

Plaintiffs allege they "were held in cells which were largely unsupervised and where the guards look[ed] the other way at fights, thefts[,] and bullying.  Violent criminals charged with such crimes as murder, attempted murder, armed robbery[,] and rape [were] held in the same cells as alleged minor offenders and these criminals often dominate[d] the other detainees and control[led] what occur[ed] in the cells."  Complaint at ¶ 28.  However, there is nothing in the record to support Plaintiffs' allegations that exposure to extended crime levels within BCB posed an unreasonable risk of damage to any of Plaintiffs' health or that it caused any one Plaintiff to be denied the basic human need of safety.   In fact, the evidence in the record establishes that none of the Plaintiffs were at a substantial risk of harm and that officers protected Plaintiffs from any violence.

For example, Plaintiff Travis Gordon testified that his cell was "too crowded" and people were pushy, but that he was never physically hurt by anyone.  Hueston Dec., Ex. 6 at PDF 69.  Similarly, Plaintiff Keith Jennings stated that he was never involved in any physical altercation.  Hueston Dec., Ex. 8 at PDF 54.  Likewise, Plaintiff Wesley Jones testified that he was not

involved in any physical altercation while at BCB and was only "[k]ind of worried" when he saw fights break out.  Hueston Dec., Ex. 9 at PDF 30, 52.  Plaintiff Yvonne Ming testified that she was scared at BCB, not because of a clear and present threat while there, but because she had never been locked up and there were "[a] bunch of strangers that didn't look welcoming[.]"  Hueston Dec., Ex. 13 at PDF 43.  She went on to state that she did not attempt to seek medical help after being released from BCB despite testifying that she suffered emotional injuries from her time at BCB.  *Id.* at PDF 57.  Although Plaintiff Steven Modes testified that he was involved in a physical altercation and was scared for his life, any threat from the physical altercation subsided within ten minutes because an officer came to his cell and informed him he would be switched to another cell.  Hueston Dec., Ex. 14 at PDF 67-70; *see also Farmer v. Brennan*, 511 U.S. 825, 843-844 (1994).

Based on this record and without anything more to support this issue, Plaintiffs have failed to create a triable issue of fact as to whether any Plaintiffs' constitutional rights were violated based upon any of the Plaintiffs' alleged exposure to a risk of violence or harm.  Accordingly, summary judgment on this issue is warranted.

### h.  Lack of Toiletries and Other Hygienic Items

Plaintiffs allege they were deprived of soap, tissues, clean water, toothbrushes, toothpaste, and toilet paper.  Complaint at ¶ 29.  Detrimental to Plaintiffs' allegations are any facts to suggest that any one of the Plaintiffs was *regularly* deprived soap, tissues, clean water, toothbrushes, toothpaste, and toilet paper or that the denial of such toiletries posed an unreasonable risk of damage to any of the Plaintiffs' health.  *See Beckford* 2010 WL 1816689, at *12; *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 488-89 (N.D.N.Y. 2009) (Suddaby, J.) (adopting Report and Recommendation of Magistrate Judge George H. Lowe) (denial of toilet paper and

soap on several occasions for a few days does not constitute a sufficiently serious deprivation under the Eighth Amendment because it is not considered a denial of the minimal civilized measure of life's necessities).

Here, there is no evidence that a single Plaintiff was detained at BCB for more than a twenty-four hour consecutive period. Moreover, there is no evidence that a single Plaintiff was *regularly* denied any such toiletry during his or her stay at BCB or that the denial of any toiletry posed an unreasonable risk of damage to a Plaintiff's future health. In fact, the evidence establishes that many Plaintiffs did receive toiletries or were told by officers at BCB that toiletries would arrive shortly.

For example, Plaintiffs' Travis Gordon and Keith Jennings both testified they had toilet paper. Hueston Dec., Ex. 6 at PDF 36, 55, 68, and Ex. 8 at PDF 30. When Plainitff Gregory Maugeri requested toilet paper and water from the officers at BCB, he was told that he would get some later in the intake process. Hueston Dec., Ex. 10 at PDF 18-19. The same was true for Plaintiff Tucker who requested water and was also told that it was going to come. Hueston Dec., Ex. 18 at PDF 37. The same was also true for Plaintiff Modes who requested toilet paper and was told he would "get it soon" since the officer was at that moment out of toilet paper. Hueston Dec., Ex. 14 at PDF 49. When Plaintiff Jacqueline Guarino asked for a sanitary napkin three to four times because she was "bleeding all over [herself]," she was told that she would receive one. Hueston Dec., Ex. 7 at PDF 32, 33, 38. After her third or fourth request, she stopped asking the guards for a sanitary napkin and did not seek any medical treatment during her time at BCB or after her time at BCB. *Id.* at 38, 70.

Because the evidence does not establish that any of the Plaintiffs were *regularly* deprived use of such toiletries or that the denial of such toiletries posed a serious risk any Plaintiff's future

health, no constitutional deprivation could have occurred.  Accordingly, summary judgment on this issue is appropriate.

### i.  Inadequate Water and Nutrition

Plaintiffs allege they "were not provided fresh, clean drinking water or adequate food." Complaint at ¶ 30.  Plaintiffs further state they were fed "one stale peanut butter and jelly or bologna sandwich, a carton of warm milk or juice and/or a small box of cereal, but were not given plastic utensils, paper plates or bowls, or napkins." *Id.*  While "the Eighth Amendment establishes as a constitutional minimum the requirement that [detainees] be provided with nutritionally adequate meals[,]" once "this threshold is met, prison officials retain considerable discretion in determining dietary constituents[.]" *Tafari v. Annets*, 06-CV-11360, 2008 WL 2413995, at *12 n. 22 (S.D.N.Y. June 12, 2008) (Peck, Mag. J.) (internal quotation marks and citations omitted), *adopted by* 2008 WL 4449372, at *2 (S.D.N.Y. Oct. 2, 2008) (Daniels, J.); *see also Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) (Conner, J.) (stating the law only entitles detainees to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") (internal quotation marks and citations omitted).

Here, the evidence establishes that Plaintiffs received nutritionally adequate food and water.  There is nothing in the record to suggest that a single Plaintiff was *regularly* deprived nutritionally adequate food and water or that the food and water given to any of the Plaintiffs posed an immediate danger to their health and well-being.

For example, Plaintiff Eric Cephus testified that he did not eat a sandwich because the "sandwich was soggy," not because it was a danger to his health or because he was denied food. Hueston Dec., Ex. 2 at PDF 38.  Similarly, Plaintiff Keith Jennings also testified that he did not

eat a sandwich because the bread was old and hard, and because he preferred sliced cheese as opposed to the "block" of cheese in the sandwich. Hueston Dec., Ex. 8 at PDF 48.

Plaintiffs Phillip Singleton and Raymond Tucker both had the opportunity to eat but did not. According to Mr. Singleton, he was given a peanut butter sandwich but gave it away to someone else who ate it. Dkt. 71 (Declaration of Mark Glen) ("Galen Dec."), Ex. P at PDF 37-39. According to Raymond Tucker, he didn't eat the sandwich because "it looked like there was some mold on some of the bread." Galen Dec., Ex. R at PDF 30, 39. However, he never touched the sandwich or saw it up close. *Id.*

Plaintiff Elli Vikki stated she had milk and cereal for breakfast during her time at BCB. Hueston Dec., Ex. 20 at PDF 48. She even claimed that BCB served "wonderful cheese and bologna sandwiches." *Id.* at PDF 58.

Plaintiff Michael McGhee did not even bother to look for food within the cell because he claimed "the room was very crowded." Hueston Dec., Ex. 11 at PDF 29, 32. He also stated he had access to milk but could not consume it because he was lactose intolerant. *Id.* at PDF 67.

According to Plaintiff Jacqueline Guarino, she "chose not to drink [the] water" because it "looked rusty[.]" Hueston Dec., Ex. 7 at PDF 56. She claimed that as a result of her stay at BCB, she was injured because she suffered from a full bladder, bruises, dehydration, and hunger but never sought any medical help. *Id.* at 70.

Plaintiff Gregory Maugeri claimed he did not have any milk because he used the milk carton "to pour out [the milk] [to use] the [carton] for water." Hueston Dec., Ex. 10 at PDF 57.

Although Plaintiff Steven Modes claims he did not receive kosher milk because the kosher symbol was absent from the milk carton, he fails to establish how the failure to have kosher milk for the brief period that he was in BCB "inflicted any pain or endangered [him] in any way, even for a moment," or otherwise was a threat to his health. *See Tafari*, 2008 WL

—20—

2413995 at *12 n.22. In fact, Mr. Modes was even given the chance to receive medical treatment and go to the hospital for chest pains but decided to forego any treatment while at BCB because he did not want to lose his place in the processing line. Hueston Dec., Ex. 14 at PDF 40. Additionally, Mr. Modes was informed that he would receive kosher food at some point during his stay. *Id.* at PDF 53-54.

Plaintiff Gregory Maugeri even went on to state that even though the sandwich he received at BCB had mold on it, the sandwich and food at BCB do not make up any of his claims in this lawsuit. Galen Dec., Ex. J at PDF 27.

To the extent some Plaintiffs complained the sandwiches at BCB had mold on them, the evidence also establishes that Plaintiffs were also offered other nutritionally adequate food during their stay at BCB such as bananas. *See e.g.*, Hueston Dec., Ex. 3 at PDF 41. Based on this record, there is no evidence to suggest that any one of the Plaintiffs did not receive nutritionally adequate food and water that posed an immediate danger to his or her health or was *regularly* deprived food and water. As such, no constitutional deprivation can exist. Although an individual Plaintiff may have a personal distaste for the food served at BCB, personal distaste is not the standard for establishing a constitutional deprivation. Accordingly, summary judgment on this issue is appropriate.

Overall, while Plaintiffs raise a variety of allegedly unconstitutional conditions, the evidence, either taken in aggregate or taken as a whole, fails to establish any one of the Plaintiffs was *regularly* denied basic human needs or was exposed to conditions that posed an unreasonable risk of serious damage to his or her future health. *Walker*, 717 F.3d at 125.

While Plaintiffs attempt to use their interrogatory responses as a blanket response to create a triable issue of material fact with respect to the allegedly unconstitutional conditions, Plaintiffs' interrogatory responses also fail to establish Plaintiffs were regularly denied basic

human needs or were subjected to unconstitutional conditions at BCB that posed an unreasonable risk of serious damage to their future health.

For example, when asked about the injuries Plaintiffs sustained during their time at BCB, Plaintiffs responded by stating: "[A]s a non-exclusive statement of compensable injuries, [P]laintiffs' emotional injuries include emotional distress, anxiety, fear, embarrassment, a loss of privacy[,] and humiliation. Plaintiff[s] also sustained injuries from threats of physical harm, and suffered hunger pains, pain and discomfort from not being able to sit or lie down. Plaintiffs also refer [D]efendants to [Interrogatory Response 3], which discusses being exposed to a substantial risk of harm and crime." *See* Dkt. 76 ("Decl. of Richard Cardinale") at Ex. 3, Interrogatory 4, p. 19-20. However, Plaintiffs' responses to Interrogatory 3, which are specific to each Plaintiff, ranged from complaints about the toilet being "gross" to not being able to sleep because the lights at BCB were on to not being able to sit in a cell because there was no space on the bench to being "very cold" and to seeing "roaches crawling around." *Id.* at Ex. 3, Interrogatory 3, p. 3-19. Missing is any evidence as to which Plaintiffs suffered which specific injuries, the alleged conditions that caused such injuries, and the effects of such injuries on any of Plaintiffs' future health. Without anything more, such bare conclusory statements are insufficient to defeat a motion for summary judgment. *See Aliuga v. Perera Co., Inc.*, 494 F. Supp. 18, 21 (S.D.N.Y. 1979) (Motley, J.) (citing *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir. 1972)).

Even accepting the above testimony as credible, and the facts alleged as true, no reasonable juror could find that Plaintiffs have satisfied the objective element of the deliberate indifference standard. Notably absent from the record is evidence to suggest any Plaintiff was *regularly* denied basic human needs or was exposed to conditions that posed an unreasonable risk of serious damage to his or her future health. Plaintiffs collectively complain about overcrowded cells, extreme temperatures and poor ventilation, crime, sanitation and garbage,

unusable toilets, lack of toiletries and other hygienic items, inadequate water and nutrition, infestation, and deprivation of sleep.  However, each Plaintiff only complains of these issues for a short period of time – within the range of ten to twenty four hours.  There is nothing in the record to suggest that any single Plaintiff was subjected to such issues for anything more than a limited period of time.  Moreover, Plaintiffs complain of such issues *without anything more* – Plaintiffs do not claim they were *regularly* denied basic human needs such as water or toilets – they only claim that they were offered water, food, and toilets in "a less-than-ideal" form.  *See Myers*, 2012 WL 3776707 at *7.  "[M]ere unpleasantness is insufficient: [to be successful,] the claim must be based upon extreme deprivations, which are barbarous or shocking to the conscience." *Wesolowski v. Kamas*, 590 F. Supp. 2d 431, 434 (W.D.N.Y. 2008) (Larimer, J.) (internal quotation marks and citations omitted).  Furthermore, there is nothing in the record to suggest that the conditions at BCB posed an unreasonable risk of serious damage to any of the Plaintiffs' future health.  Most Plaintiffs did not seek any sort of medical treatment and none of the Plaintiffs provide evidence of having suffered any long term physical or emotional harm due to time spent in the BCB.  *See, e.g.*, Hueston Dec., Ex. 5 at PDF 39, Ex. 13 at PDF 57, Hueston Dec., Ex. 15 at PDF 43, and Ex. 19 at PDF 65-66.

Thus, without anything more to support their allegations, the evidence put forth by Plaintiffs does not and cannot amount to a deprivation of their rights sufficient to satisfy the objective prong.  For these reasons, Defendant's motion for summary judgment on this issue is granted.

### 2. Plaintiffs Fail to Satisfy the Subjective Prong

While the Court need not address the subjective prong, see, for example, *Davidson v. Coughlin*, 920 F. Supp. 305, 309 (N.D.N.Y. 1996) (McAvoy, J.) (finding judgment appropriate

where plaintiff fails to satisfy one prong), the Court nevertheless finds that even if Plaintiffs could satisfy the objective prong, summary judgment in favor of Defendants is appropriate for the independent reason that no reasonable juror could find any Plaintiff has satisfied the subjective prong – *i.e.* no reasonable juror could find that any Plaintiff has shown Defendants knew the alleged unconstitutional conditions posed an excessive risk to any of the Plaintiffs' health or safety at any time, yet disregarded the risk.

Under the subjective prong:

the charged official must act with a sufficiently culpable state of mind. The required state of mind, equivalent to criminal recklessness, is that the official knows of an[d] disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Thus, to satisfy the subjective prong of the deliberate indifference standard, [a plaintiff] must demonstrate that the [Defendants] knew of and disregarded an excessive risk to [a plaintiff's] health and safety.

*Sereika v. Patel*, 411 F. Supp. 2d 397, 404-05 (S.D.N.Y. 2006) (Marrero, J.) (internal quotation marks and citations omitted).  "Negligence does not, however, satisfy the scienter requirement necessary to support a claim for cruel and unusual punishment [under the Eighth Amendment]. *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) (internal quotation marks and citations omitted).

While in some instances, "[e]vidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk," *Walker*, 717 F.3d at 125 (internal quotation marks omitted), prison officials who act reasonably cannot be found liable under the Eighth Amendment.  As the Supreme Court has explained, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.  A prison official's duty under the Eighth Amendment is to

ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping [potentially] dangerous men in safe custody under human conditions." *Farmer*, 511 U.S. at 844-45 (internal quotation marks and citations omitted).

In this case, Defendants argue "there is not a shred of evidence that [Defendants were] made aware of the supposedly sub-human conditions at BCB and then consciously chose to disregard them." Memo in Support at 18.  To create a triable issue of fact with respect to the subjective prong, Plaintiffs simply argue that "[t]he excessive risk to inmate health or safety in BCB was obvious[.]" Memo in Opp. at 15.  According to Plaintiffs, because Defendants Tobin and Kobeitsch "testified during their depositions that it was their practice to visit BCB every day," they "had knowledge of the obvious inhumane conditions." *Id.*  Plaintiffs also claim that "because [Defendant Pinerio] was the highest ranking NYPD official in charge of BCB, it is reasonable to infer that [he] knew as much about the obvious harmful conditions in BCB as Tobin and Kobeitsch, yet Pineiro, like all other City officials, failed to take sufficient remedial action." *Id.* at 15-16 (internal citations omitted).  Plaintiffs' obviousness argument fails for a variety of reasons.

First, to support their obviousness argument, Plaintiffs cite to a variety of news articles and letters about the conditions at BCB claiming that these "news accounts of the horrid conditions of BCB [] corroborate [P]laintiffs' allegations and [] put the City of New York on notice of the conditions [at BCB]." Memo in Opp. at 2-4; *see also* Decl. of Richard Cardinale at Exs. 1-2.  While the parties dispute whether the news articles and letters constitute inadmissible hearsay, the Court need not decide that issue for purposes of this motion because Plaintiffs fail to draw any connection between the conditions described in the news articles and letters to the evidence in this case to create a triable factual issue on the subjective prong. *See Tokio Marine & Fire Ins. Co. v. Rosner*, 206 F. App'x 90, 95 (2d Cir. 2006) (failure to link newspaper article

—25—

to evidence of deceptive business practices and fraudulent inducement could not raise triable factual issue). For example, Plaintiffs make no attempt to link articles in the 1990's to the allegedly unconstitutional conditions Plaintiffs now challenge, which took place between July 2011 and July 2013, almost twenty years later. Plaintiffs solely state the news articles and letters "corroborate" Plaintiffs allegations. This is insufficient.

Second, no liability could exist under the subjective prong because Defendants have presented substantial evidence to establish they responded reasonably to any risk that existed. *See Farmer*, 511 U.S. at 844-45. Log book entries and testimony from Defendant Tobin about the practices and conditions at BCB reveal the reasonable steps officers at BCB must and do take when faced with the allegedly unconstitutional conditions. For example, Defendant Tobin testified that "[s]hould an individual wish to sleep during their stay at BCB, they are provided with padded sleeping mats and a blanket *upon request*." Dkt. 72 ("Tobin Declaration") at ¶ 60 (emphasis added). No Plaintiff ever requested a sleeping mat or blanket. *See, e.g.*, Hueston Dec., Ex. 5 at PDF 28. Defendant Tobin further testified that feminine hygiene products are available upon request and that there is a sufficient supply of toilet paper in the basement of the BCB. Tobin Declaration at ¶¶ 73, 81. Each Plaintiff who requested such items were told he or she would receive them – not that they were unavailable. *See, e.g.*, Hueston Dec., Ex. 10 at PDF 18-19; Hueston Dec., Ex. 14 at PDF 49. Hueston Dec., Ex. 18 at PDF 37; Hueston Dec., Ex. 14 at PDF 49. The testimony provided by Plaintiffs further corroborates that Defendants had practices in place where officers at BCB would respond reasonably to any risk that existed.

For example, when Plaintiff Keith Jennings complained to officers at BCB about the milk being warm, they offered him water instead. Hueston Dec., Ex. 8 at PDF 49. Likewise, when Plaintiff Gregory Maugeri requested toilet paper and water from the officers at BCB, he was told that he would get some later in the intake process. Hueston Dec., Ex. 10 at PDF 18-19. When

he suffered an anxiety attack, officers were quick to move him to a medical cell and he was later taken to a hospital by ambulance where he received medical treatment. *Id.* at PDF 31.

Like the above-mentioned Plaintiffs, when Plaintiff Raymond Tucker requested water, he was told that it was going to come. Hueston Dec., Ex. 18 at PDF 37. The same was also true for Plaintiff Steven Modes who requested toilet paper and was told he would "get it soon" since the officer was, at that moment, out of toilet paper. Hueston Dec., Ex. 14 at PDF 49. When Plaintiff Michael Spalango complained to officers about his heart condition, his testimony makes clear that the officers provided him an opportunity to go to the hospital. Hueston Dec., Ex. 17 at PDF 33-34.

To the extent any Plaintiffs did complain to Defendants and officers at BCB about the allegedly unconstitutional conditions, the record is devoid of any evidence that Defendants acted with a sufficiently culpable state of mind, equivalent to criminal recklessness, to satisfy the subjective prong. *See Sereika*, 411 F. Supp. 2d at 404-05. Instead, the record establishes that, at most, Defendants and officers at BCB acted with negligence. However, "[n]egligence does not . . . satisfy the scienter requirement necessary to support [Plaintiffs'] claims[.]". *Trammell*, 338 F.3d at 165 (internal quotation marks and citations omitted).

For example, Plaintiff Eric Cephus testified that he complained to an officer at BCB about his cell being overcrowded, but he failed to provide any testimony as to how the officer intentionally disregarded a risk to his health or safety; instead, the officer responded he was "just doing his job." Hueston Dec., Ex. 2 at PDF 40. Although Plaintiff Jacqueline Guarino testified that when she asked for a sanitary napkin at least three times, she was ignored, she also testified that she was told that she would receive a sanitary napkin when she went "upstairs." Hueston Dec., Ex. 7 at PDF 31-33. Although it appears Plaintiff Guarino never received a sanitary napkin, her testimony does not establish that Defendants or any officer at BCB acted with a

sufficiently culpable state of mind (rather than inadvertently or negligently) in failing to provide her with one. *Id.*; *cf.Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) (Conner, J.) (summary judgment inappropriate where another inmate observed plaintiff with blood all over her legs but the defendant officer still "refused to provide her with a sanitary napkin").

Plaintiffs do not attempt to rebut any of this evidence with facts to the contrary. Instead, Plaintiffs claim that "[t]he log book entries and other records concerning the alleged maintenance of BCB that [D]efendants have submitted [] do not establish that [D]efendants took sufficient remedial action." Memo. in Opp. at 16. The standard, however, is not whether or not Defendants took "sufficient" action.[1] Rather, the standard is whether Defendants responded reasonably even if any ultimate risk was not averted. *Farmer*, 511 U.S. at 844-45. As established above, Defendants responded reasonably.

Third, the evidence establishes that many Plaintiffs made no complaints to put any officers on notice of the allegedly unconstitutional conditions. Because Defendants were not made aware of the alleged unconstitutional conditions described above, no reasonable juror could find that Defendants knew the alleged unconstitutional conditions posed an excessive risk to the aforementioned specific Plaintiffs' health and safety, yet disregarded that risk. *See, e.g.*, *Atkins*, 372 F. Supp. 2d at 406 (summary judgment appropriate where there was no evidence that

---

[1] Plaintiffs also argue that the log books and other alleged maintenance records are inadmissible as hearsay. Memo. in Opp. at 16, n. 4. However, the documents are admissible under the "business records" exception pursuant to Federal Rule of Evidence 803(6) because "(A) the record[s] [were] made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record[s] [were] kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record[s] was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification []; and (E) the opponent [has] not show[n] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

a specific Defendant was personally involved in depriving Plaintiff of hygienic items).  For example, Plaintiff Michael McGhee did not request any basic human necessity from Defendants or any other officer at BCB because he did not speak to them about any issues and/or conditions.  Hueston Dec., Ex. 11 at PDF 34, 67.  Although Plaintiff Dmitriy Miloslavskiy claimed he could not sleep, he never asked any of the officers for a mat or anything else to sleep on.  Hueston Dec., Ex. 12 at PDF 26.  Plaintiff Darnell similarly testified that he did not request a mat to sleep on or any toiletries because "some guy laying on the floor or something" told him none were available.  Hueston Dec., Ex. 3 at PDF 45.  Plaintiff Deborah Gonzalez also did not "request anything from the officers" such as a mat to sleep on.  Hueston Dec., Ex. 5 at PDF 28.  Although she claims she was afraid officers would berate her, she provides no reason as to her belief.

Based on the foregoing, summary judgment is appropriate because the evidence fails to establish Defendants knew the alleged conditions of (1) overcrowding, (2) deprivation of sleep, (3) unusable toilets, (4) extreme temperatures and poor ventilation, (5) poor sanitation and garbage, (6) infestation, (7) crime, (8) lack of toiletries and other hygienic items, and (9) inadequate water and nutrition posed an excessive risk to Plaintiffs' health and safety, yet disregarded that risk.

### 3.  Plaintiffs' Constitutional Claims Do Not Rise to Punitive Intent

Defendants argue that summary judgment is appropriate on Plaintiffs' punitive intent theory of liability because "there is no evidence in the record that police offers were rude or demeaning, or that any of the conditions at [BCB] resulted from any intent to 'punish' or retaliate against any individual plaintiff whatsoever[.]"  Dkt. 78 ("Defendants Reply Memo") at 6.

"The Fifth Amendment's Due Process Clause forbids subjecting pretrial detainees to punitive restrictions or conditions."  *Turkmen v. Hasty*, 789 F.3d 218, 237 (2d Cir. 2015)

(citations omitted).  To establish a violation at the summary judgment stage, Plaintiffs must prove

Defendants "(1) with punitive intent, (2) personally engaged in conduct that caused the

challenged conditions of confinement.  Absent an expressed intent to punish, we may only infer

that Defendants acted with punitive intent if the challenged conditions were not reasonably

related to a legitimate goal—if they were arbitrary or purposeless." *Id.* at 238 (internal quotation

marks, brackets, and citations omitted).  Additionally, "[f]ederal courts have long recognized that

punitive intent is not often admitted.  The Supreme Court has noted that it can be inferred if the

conditions of confinement are not reasonably related to a legitimate goal.  If the conditions under

which one is held have no reasonable connection to a legitimate goal of the state, then one

logical assumption is that they are imposed for no other purpose than to punish." *Id.* at 244

(internal quotation marks and citations omitted).

Here, Plaintiffs argue they can "easily establish a Due Process violation under the 'punitive

intent' theory of liability" because they "have shown that they were subjected to adverse conditions

of confinement, which have not been adequately addressed in years, and [D]efendants have not

offered a legitimate governmental purpose for these conditions." Memo in Opp. at 11-12.

Plaintiffs are wrong.

Although Plaintiffs rely on *Smart v. City of New York*, 08-CV-2203, 2009 WL 862281, at

*10 (S.D.N.Y. Apr. 1, 2009) (Baer, Jr., J.) for the proposition that "the court denied the City's

motion for summary judgment holding that the denial of food, water[,] and access to a lavatory

for fourteen hours was not reasonably related to any legitimate governmental purpose and

therefore supported an inference  of punitive intent[,]" the facts in *Smart* are markedly different

than the facts in this case.  Memo in Opp. at 12 (citation omitted).  In *Smart*, the court held:

> [A] reasonable jury could conclude that the officer's consistent disregard of
> Smart's repeated requests was intended to have a punitive effect or, at a
> minimum, was not reasonably related to a legitimate governmental purpose which

—30—

> supports an inference of punitive intent. Although officers surely cannot be
> expected to cater to a pretrial detainee's every request and there are, for example,
> legitimate governmental purposes that justify not feeding every detainee upon
> arrival at a police station, deliberate denial of food, water or access to a restroom
> for fourteen hours is not reasonably related to any legitimate governmental
> purpose and thus the facts before the Court support an inference of punitive intent.

*Smart*, 2009 WL 862281 at *10 (internal quotation marks and citations omitted). The same facts

do not exist here for reasons previously discussed. For example, the evidence in the record does

not establish that any Defendant (1) repeatedly and consistently disregarded substantial issues

brought to their attention about the allegedly inhumane conditions at BCB, and (2) consciously

chose to allow those conditions to continue such that it would not be related to any legitimate

government purpose. *See supra* Section II.A.2. Without anything further from Plaintiffs,

summary judgment on this issue is appropriate.

### 4. Individual Defendants are Entitled to Qualified Immunity

Defendants argue that the Individual Defendants are entitled to qualified immunity because

"the evidence is clear that Plaintiffs suffered no constitutional violation under either the objective

or the subjective prong of the deliberate indifference standard." Memo in Support at 20. As

previously set forth above, Defendants are correct. Accordingly, because Plaintiffs failed to create

a triable issue of fact as to whether their constitutionally protected rights were violated under either

the deliberate indifference theory of liability or the punitive intent theory of liability, the Individual

Defendants are entitled to a qualified immunity defense. *See Pearson v. Callahan*, 555 U.S. 223,

243-44 (2009) (qualified immunity defense exists where officers did not violate clearly established

law).

### 5. Plaintiffs' 42 U.S.C. § 1983 Claim Against the City of New York Fails

Plaintiffs' failure to create a triable issue of fact as to whether they suffered constitutional

deprivations based on the conditions at BCB under either the deliberate indifference theory of

liability or the punitive intent theory of liability is also fatal to their claims brought under 42 U.S.C. § 1983 seeking to hold the City of New York liable.  A municipality may only be held liable under § 1983 if a plaintiff can demonstrate that a deprivation of his or her constitutional rights resulted from a municipal policy or custom.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978).  To prevail on a municipal liability claim, Plaintiffs must show that an official policy or custom of the City of New York or a City agency of New York caused or was the "moving force" behind the creation of a constitutional violation against them. *Id.* at 694-95.  Therefore, it follows logically that Plaintiffs must sufficiently demonstrate an underlying violation of their federally protected rights to assert such claim.  *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (finding no liability under § 1983 where no constitutional right was violated).  Because Plaintiffs have failed to demonstrate an underlying violation of their constitutional rights, summary judgment is appropriate on this issue.

## CONCLUSION.

For the reasons stated above, Defendants' Motion for Summary Judgment, Dkt. 68, is GRANTED.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: August _13_, 2015
      Brooklyn, New York